**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ESTATE OF MILAGROS "MILLIE" ORTIZ, by and through its Personal Representative, EVELYN ALICEA,

Plaintiff,

v.

CITY OF ORLANDO, FLORIDA; FORD MOTOR COMPANY, a Delaware corporation; PUBLIC SAFETY SUPPLY, LLC, a Florida limited liability company; DANA SAFETY SUPPLY, INC.; and FEDERAL SIGNAL CORPORATION, INC.,

Defendants.
_________________________________/

Case No. 6:26-cv-02625-GAP-NWH

**DEMAND FOR JURY TRIAL**

**SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH, PRODUCT LIABILITY, CIVIL RIGHTS VIOLATIONS, AND DAMAGES AND DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiff, the ESTATE OF MILAGROS "MILLIE" ORTIZ, by and through its duly appointed Personal Representative, EVELYN ALICEA, and sues Defendants CITY OF ORLANDO, FLORIDA; FORD MOTOR COMPANY; PUBLIC SAFETY SUPPLY, LLC; DANA SAFETY SUPPLY, INC.; and FEDERAL SIGNAL CORPORATION, INC., alleging as follows:

## INTRODUCTION

1. This action arises from the preventable death of 92-year-old Milagros "Millie" Ortiz, an innocent passenger killed when an Orlando Police Department ("OPD") patrol vehicle entered a signalized intersection against a red light and struck the vehicle taking her home from bingo. Millie was not suspected of any crime, was not fleeing police, and posed no threat to any officer or member of the public.

2. The police action arose from a suspected traffic violation unrelated to Millie or her vehicle, not from any threat she posed.

3. At approximately 1:48 a.m. on January 18, 2026, Millie's vehicle traveled southbound through the intersection of South Semoran Boulevard and Hoffner Avenue on a green signal while OPD Officer Andrew McKuhen waited at a red signal on Hoffner Road in marked patrol vehicle number 10467.

4. After reportedly observing another motorist make an illegal U-turn, McKuhen chose to take police action and entered the intersection against the red signal.

5. That discretionary response set in motion the events that ended in a fatal collision.

6. Video evidence and a witness account indicated that the patrol vehicle's red and blue emergency lights appeared steady rather than flashing normally, no audible siren was recalled, and the lights then went dark.

7. Despite the apparent loss of emergency warnings, McKuhen continued through the intersection, and the OPD vehicle struck the Jeep carrying Millie.

8. The collision caused catastrophic injuries from which Millie died the following day.

9. The crash report found the OPD vehicle at fault for failing to yield the right-of-way.

10. The investigation revealed recurring emergency-equipment problems, including partially functioning strobes, malfunctioning control buttons, intermittent siren operation, and a report weeks before the collision that the sirens were not working.

11. Despite those life-safety defects, the City kept the patrol vehicle available for police operations.

12. The completed vehicle reflected the combined work of Ford Motor Company, which manufactured and marketed the police-rated vehicle for foreseeable law-enforcement upfitting; Public Safety Supply, LLC, which designed and installed the emergency-equipment integration and, on information and belief, maintained the vehicle's emergency equipment until in or around March

2025; and Federal Signal Corporation, Inc., which manufactured the installed warning lights and siren components.

13. In or around March 2025, Dana Safety Supply, Inc. acquired assets of Public Safety Supply, LLC, including the business of upfitting and maintaining OPD vehicles, and from that time through January 18, 2026, was responsible for maintaining the subject patrol vehicle's emergency warning equipment.

14. This Second Amended Complaint seeks accountability for negligent police driving, negligent maintenance, repair, and deployment, municipal policies and customs that exposed civilians to known danger, and defective products or integration that failed when reliable warnings were most needed.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

15. This action seeks damages exceeding $92,000,000.00, exclusive of interest, costs, and attorneys' fees.

16. This Court has original subject-matter jurisdiction over Plaintiff's claims arising under 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), and supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

17. Venue is proper in the United States District Court for the Middle District of Florida, Orlando Division, under 28 U.S.C. § 1391(b)(2) and Local Rule 1.04(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Orange County, Florida, where the collision, injuries, and death occurred, where the City is located, and where the subject products were used and caused injury.

18. The City is a municipality and political subdivision subject to suit under section 768.28, Florida Statutes, and a "person" subject to municipal liability under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978).

19. Plaintiff provided the written notice required by section 768.28, Florida Statutes, for the state-law claims against the City.

20. All conditions precedent to maintaining this action have been performed, satisfied, waived, or excused.

21. This Court has personal jurisdiction over Ford Motor Company, Public Safety Supply, LLC, Dana Safety Supply, Inc., and Federal Signal Corporation, Inc. because each transacted business in Florida, placed products or services into the Florida stream of commerce, and committed acts or omissions involving products that caused injury here.

22. Joinder is proper under Federal Rule of Civil Procedure 20(a)(2) because the claims against all Defendants arise from the same collision and related transactions

or occurrences and present common questions concerning the patrol vehicle, warning system, causation, and damages.

23. Plaintiff pleads alternative and inconsistent theories under Federal Rule of Civil Procedure 8(d)(2)–(3); allegations against one Defendant do not relieve another of responsibility.

## PARTIES

24. Milagros "Millie" Ortiz was 92 years old at the time of her death.

25. Plaintiff Evelyn Alicea is the duly appointed Personal Representative of the Estate of Milagros Ortiz and brings this action on behalf of the Estate and all statutory survivors under the Florida Wrongful Death Act, sections 768.16 through 768.26, Florida Statutes.

26. Millie's known children and statutory survivors are Judy Santiago, adult daughter; Evelyn Alicea, adult daughter; and Antonio Ortiz, adult son.

27. Defendant City of Orlando, Florida is a Florida municipal corporation responsible for OPD and for the policies, customs, training, supervision, discipline, maintenance, inspection, approval, and deployment alleged herein.

28. At all material times, Andrew McKuhen was a sworn OPD officer and City employee acting within the course and scope of his employment and in furtherance of City business.

29. Defendant Ford Motor Company ("Ford") is a Delaware corporation that designed, manufactured, assembled, tested, marketed, distributed, and sold the 2019 Ford utility vehicle bearing VIN 1FM5K8AR5KGB44385.

30. Ford manufactures and markets Police Interceptor and police-rated vehicles specifically for law-enforcement use and knew or should have known that the subject vehicle would be upfitted with emergency lighting, sirens, controls, wiring, and related life-safety equipment.

31. Defendant Public Safety Supply, LLC ("PSS") is a Florida limited liability company, Florida Department of State Document No. L17000173568, with a principal address of 625 West 18 St., Hialeah, Florida 33010. Its registered agent is Alberto Espinosa, 625 West 18 St., Hialeah, Florida 33010.

32. The Florida Department of State administratively dissolved PSS on September 26, 2025, for failure to file an annual report. Plaintiff alleges that PSS remains subject to suit for the claims alleged herein, which arise from acts and omissions that occurred before its dissolution.

33. Until in or around March 2025, PSS was engaged in the business of designing, assembling, installing, integrating, selling, supplying, and maintaining emergency-vehicle equipment, and it upfitted the subject Ford vehicle for police use.

34. PSS selected components, determined the integration and wiring configuration, installed the emergency light bar, siren, controls, and associated equipment, and supplied the completed upfitted vehicle for its known police and life-safety purpose.

35. On information and belief, from the time of the upfit until in or around March 2025, PSS was responsible for servicing, maintaining, inspecting, and repairing the emergency warning equipment on OPD vehicles, including the subject patrol vehicle.

36. Defendant Dana Safety Supply, Inc. ("Dana") is a corporation engaged in the business of supplying, installing, servicing, and maintaining emergency-vehicle equipment for law-enforcement agencies, including in Florida.

37. In or around March 2025, Dana acquired assets of PSS through an asset purchase. A portion of the acquired business consisted of the upfitting and maintenance of OPD vehicles, which Dana took over from PSS.

38. From in or around March 2025 through January 18, 2026, Dana undertook and was responsible for servicing, maintaining, inspecting, diagnosing, and repairing the emergency warning equipment on OPD vehicles, including the subject patrol vehicle.

39. Plaintiff's claims against Dana are limited to Dana's own negligence in the maintenance, inspection, diagnosis, and repair of the subject patrol vehicle's

emergency warning equipment from in or around March 2025 through January 18, 2026. Plaintiff does not assert product liability or warranty claims against Dana based on the original design or installation of the upfit.

40. Defendant Federal Signal Corporation, Inc. ("Federal Signal") designed, manufactured, tested, marketed, distributed, and supplied emergency warning lights, sirens, controls, and related components installed in the subject patrol vehicle for law-enforcement use.

41. Ford, PSS, and Federal Signal are collectively referred to as the "Product Liability Defendants." Dana is not a Product Liability Defendant.

42. At all relevant times, the Product Liability Defendants were engaged in the business of placing their respective products and services into the stream of commerce and expected those products to reach Florida law-enforcement users and the motoring public.

**THE DEATH OF MILLIE ORTIZ**

43. During the early morning hours of January 18, 2026, Millie was riding as an innocent passenger in a friend's 2016 Jeep Patriot, VIN 1C4NJPBB7GD738293.

44. The Jeep was owned by Joshua Jose Santana and driven by Xiomara E. Pontier.

45. Millie and her friend were returning home from bingo.

46. The Jeep traveled southbound on South Semoran Boulevard toward Hoffner Avenue, and the traffic signal controlling its movement was green.

47. McKuhen approached the same intersection westbound on Hoffner Road while operating marked OPD patrol vehicle number 10467, the 2019 Ford utility vehicle bearing VIN 1FM5K8AR5KGB44385.

48. The City owned the OPD vehicle and was self-insured.

49. McKuhen was stopped at a red traffic signal and reportedly observed another motorist make an illegal U-turn.

50. McKuhen elected to initiate police action in response to that suspected traffic violation and began entering the intersection against the red signal.

51. A City traffic camera captured McKuhen activating the patrol vehicle's emergency warning lights as he began to move.

52. A witness positioned next to the OPD vehicle reported that the red and blue lights appeared steady rather than flashing normally.

53. At least one witness did not recall hearing an audible siren.

54. After the patrol vehicle passed the northbound lanes and entered the southbound lanes of South Semoran Boulevard, the emergency lights went completely dark.

55. Despite the apparent malfunction or loss of the warning system, McKuhen continued into and through the intersection.

56. The Jeep simultaneously and lawfully proceeded through the intersection with the green signal.

57. The OPD vehicle entered the Jeep's path, and the front of the OPD vehicle struck the Jeep's left side.

58. Both vehicles sustained disabling damage and were towed from the scene.

59. McKuhen, Pontier, and Millie were transported to Orlando Regional Medical Center by the Orlando Fire Department.

60. Millie suffered catastrophic injuries and died from those injuries on January 19, 2026.

61. The Florida Traffic Crash Report assigned fault to the OPD vehicle for failure to yield the right-of-way and recorded no contributing driver action by Pontier.

62. Millie had nothing whatsoever to do with the suspected illegal U-turn that precipitated McKuhen's police action.

## STATE ATTORNEY INVESTIGATION

63. The Office of the State Attorney for the Ninth Judicial Circuit subsequently reviewed the circumstances surrounding Millie's death.

64. The State Attorney declined to bring criminal charges against McKuhen after determining that the evidence was insufficient to establish beyond a

reasonable doubt that he intentionally drove recklessly or acted with the willful or wanton disregard required for criminal liability.

65. That determination addressed criminal culpability under the criminal burden of proof; it did not adjudicate civil negligence, product defect, constitutional injury, or any Defendant's civil responsibility.

66. The investigation identified evidence that the patrol vehicle's emergency lights may have suffered a mechanical failure while McKuhen was entering the intersection and identified a documented maintenance history involving the vehicle.

67. The State Attorney found no evidence that McKuhen intentionally turned off the emergency lights, and Plaintiff does not allege that he intentionally disabled them.

68. Plaintiff alleges that the warning equipment malfunctioned during McKuhen's entry into the intersection and that the City, Dana, and the Product Liability Defendants, as applicable, had actual or constructive notice of defects, failure modes, prior complaints, or the need for further inspection, maintenance, warning, or corrective action.

## DEFECTIVE EMERGENCY EQUIPMENT — PRIOR NOTICE

69. Emergency lights and sirens installed on police vehicles serve a critical public-safety function by warning motorists and pedestrians when officers exercise statutory privileges contrary to ordinary traffic controls.

70. Reliable visual and audible warnings are especially important when an officer intends to enter an intersection against a red signal.

71. Long before Millie's death, the City and persons responsible for maintaining, inspecting, servicing, approving, and deploying patrol vehicle number 10467 received repeated reports concerning its emergency warning equipment.

72. In March 2020, the subject vehicle was involved in a collision, and emergency lights were removed and reinstalled during repairs.

73. In March 2023, a work order documented that only part of the vehicle's strobe lights were functioning, and repairs were reportedly performed.

74. In February 2025, another work order documented that buttons on the emergency control system were not functioning, including the siren.

75. The February 2025 problem reportedly could not be replicated during inspection, and no repair was completed in response to that report.

76. On information and belief, the March 2020, March 2023, and February 2025 events occurred while PSS was responsible for maintaining the subject vehicle's

emergency warning equipment, and before Dana acquired that business in or around March 2025.

77. In September 2025, another work order documented intermittent operation of the siren box.

78. Maintenance records reportedly indicated that manipulation of the controls was required and that, even then, the equipment might not function.

79. Because the equipment operated during that inspection, no repair was made.

80. In November 2025, only weeks before Millie's death, another work order reported that the sirens were not working.

81. That work order indicated that the siren box might require reprogramming, and the operator was reportedly advised to take the vehicle to public safety.

82. The September 2025 and November 2025 reports arose after Dana had assumed, in or around March 2025, responsibility for maintaining the subject patrol vehicle's emergency warning equipment. Dana knew or should have known of the vehicle's prior history of warning-equipment failures.

83. On information and belief, Dana did not diagnose the intermittent failures under conditions reasonably calculated to reproduce them, did not permanently correct them, and did not recommend or require removal of the vehicle from emergency service before January 18, 2026.

84. Despite this recurring history involving equipment specifically intended to warn civilians during emergency vehicle operations, the patrol vehicle remained available for police use.

85. An intermittent safety defect is not eliminated merely because equipment functions during a brief inspection; such reports require diagnosis under conditions reasonably calculated to reproduce the failure and correction before emergency deployment.

86. On January 18, 2026, the precise danger against which functioning emergency warnings are intended to protect materialized: the lights appeared steady, went dark, and no audible siren was recalled while the patrol vehicle entered against a red signal.

87. The Product Liability Defendants knew or should have known that emergency warning components and integration would be exposed to vibration, heat, electrical load, repeated activation, maintenance, collision repair, and long-term police use, and should have been designed, manufactured, assembled, tested, and accompanied by warnings adequate for those foreseeable conditions.

88. To the extent discovery shows that a defective Ford electrical architecture, a defective PSS integration or installation, a defective Federal Signal component, or a combination thereof produced the intermittent failures, each such defect was a substantial legal cause of inadequate warning and the fatal collision.

89. To the extent discovery shows that negligent maintenance, inspection, diagnosis, or repair from in or around March 2025 through January 18, 2026 allowed those failures to persist uncorrected, Dana's negligence was a substantial legal cause of inadequate warning and the fatal collision.

## DANGEROUS OPD VEHICLE OPERATIONS — PRIOR NOTICE

90. Millie's death occurred after other innocent civilians had been killed during dangerous OPD vehicle operations undertaken to pursue or apprehend persons suspected of criminal activity.

91. On or about February 10, 2023, OPD officers engaged in a vehicle pursuit through the Parramore community.

92. During that pursuit, the fleeing motorist entered an intersection against a red signal and crashed into a vehicle occupied by 28-year-old Delmy Alvarez, a mother of two.

93. Alvarez was killed even though she was not the person police were pursuing.

94. That pursuit was subsequently determined to have violated OPD pursuit policy, litigation followed, and the City settled the litigation.

95. The Alvarez incident placed the City on notice of the potentially lethal consequences to innocent motorists when restrictions governing dangerous police vehicle operations are not followed or adequately enforced.

96. On February 12, 2025, OPD officers engaged in another vehicle pursuit reportedly originating from an unreadable license plate.

97. Gerald Neal, age 56, was an innocent pedestrian who had nothing to do with the suspected offense.

98. The fleeing vehicle struck Neal, and seconds later an unmarked OPD Ford F-150 participating in the pursuit also struck him.

99. Neal died, and the pursuit reportedly failed to satisfy OPD requirements governing when officers were authorized to initiate or continue vehicle pursuits.

100. Neal's death provided additional notice that dangerous OPD vehicle operations could impose lethal consequences upon innocent civilians.

101. On information and belief, discovery will identify numerous additional OPD pursuits, emergency responses, red-light entries, policy deviations, preventable collisions, citizen complaints, internal reviews, near misses, and discipline decisions that placed the public at risk.

102. The similarity, recurrence, and gravity of those events made the need for corrective policy, training, supervision, discipline, and vehicle-safety controls obvious to City policymakers.

103. Nevertheless, the City failed to implement or enforce adequate corrective measures and thereby communicated that unsafe vehicle operations and deviations from life-safety requirements would be tolerated.

## PRODUCT DEFECT ALLEGATIONS

104. Ford designed and marketed the subject police-rated vehicle for the known and foreseeable purpose of law-enforcement upfitting, including integration of high-current emergency lights, sirens, control modules, and associated wiring.

105. The Ford vehicle's electrical architecture, connection points, load management, circuit protection, grounding, compatibility provisions, redundancy, diagnostic capability, and upfitter guidance were required to safely accommodate that known use.

106. The subject Ford vehicle was defective and unreasonably dangerous if, as discovery is expected to show, its design inadequately accommodated foreseeable emergency-equipment integration or its particular electrical system deviated from Ford's intended design and performance specifications.

107. Ford failed to provide adequate warnings and instructions concerning electrical-system limitations, compatible loads and components, grounding and circuit-protection requirements, diagnostic protocols, inspection intervals, or failure modes relevant to the reliable integration of life-safety equipment.

108. PSS undertook to deliver a completed police vehicle whose emergency warning system would operate reliably when needed to protect officers and the public.

109. PSS designed the integration scheme, selected components, determined wiring and control configurations, and installed the warning equipment on the Ford platform.

110. The PSS integration was defective and unreasonably dangerous if, as discovery is expected to show, it lacked adequate redundancy, circuit protection, load management, grounding, connectors, strain relief, environmental protection, diagnostic safeguards, or fail-safe behavior, or if the installation deviated from PSS's intended plan or applicable specifications.

111. PSS failed to provide adequate warnings, instructions, maintenance protocols, inspection criteria, and out-of-service criteria concerning intermittent operation, reprogramming, prior collision repair, and recurring failures.

112. Federal Signal manufactured emergency lights, sirens, control equipment, and related components specifically for police and emergency-vehicle use, where reliable operation is a life-safety requirement.

113. The installed Federal Signal products were defective and unreasonably dangerous if, as discovery is expected to show, a component deviated from intended specifications or the design was susceptible to intermittent operation, steady illumination, loss of output, control failure, or inadequate fault detection under foreseeable use.

114. Federal Signal failed to provide adequate warnings and instructions concerning known or knowable failure modes, compatibility limitations, maintenance and inspection requirements, useful life, reprogramming, or the need to remove equipment from service after intermittent failures.

115. The patrol vehicle and warning system reached the City and were used in a substantially foreseeable condition; any changes associated with foreseeable police upfitting, routine maintenance, or collision repair do not relieve a Defendant whose product or instructions failed to safely account for such foreseeable use.

116. At all material times, safer reasonable alternative designs, integration methods, components, warnings, inspection protocols, and fail-safe features were technologically and economically feasible, including designs that would prevent a single-point or intermittent failure from extinguishing visual and audible warnings without a conspicuous fault indication.

117. The City and PSS relied on the Product Liability Defendants' skill, judgment, specifications, representations, and warranties that the vehicle, integration, and warning components were suitable for ordinary police emergency use and the particular known purpose for which they were supplied.

118. The defective condition of the vehicle and warning system was not reasonably apparent to Millie, Pontier, or members of the motoring public, who had no ability to inspect, maintain, or correct it.

119. The failures observed on January 18, 2026, together with the prior recurring complaints, are evidence from which a jury may infer defect, negligent design or integration, negligent manufacture or assembly, inadequate warnings, and breach of warranty under the circumstances.

120. Plaintiff will identify additional defect particulars, alternative designs, warnings, and responsible actors through inspection, expert analysis, electronically stored data, schematics, testing, maintenance records, and discovery that are principally within Defendants' control.

**FORESEEABILITY AND CAUSATION**

121. The collision and fatal injuries were foreseeable results of entering a signalized intersection against a red light without reliable visual and audible emergency warnings.

122. Functioning emergency warnings would have provided Pontier and other lawful motorists time and information to perceive the OPD vehicle, stop, slow, or take evasive action.

123. The emergency warning system was intended to prevent precisely the type of intersection collision that occurred.

124. No act or omission by Millie caused or contributed to the collision or her injuries.

125. Pontier was proceeding with a green signal, and the crash report recorded no contributing action by her.

126. The respective acts, omissions, policies, customs, defects, and breaches alleged against Defendants combined and concurred to produce a single indivisible injury and death.

127. Each Defendant had the ability, through reasonable driving, policy, training, supervision, maintenance, design, manufacture, assembly, testing, warning, or removal from service, to prevent the fatal sequence.

128. The precise allocation of responsibility among the City, Ford, PSS, Dana, and Federal Signal is information particularly within Defendants' possession and is appropriately determined through discovery and trial.

129. Plaintiff alleges each theory in the alternative and does not concede that any intervening change, misuse, maintenance act, repair, or conduct was unforeseeable or superseding.

130. To the extent Defendants contend that another person or entity caused or contributed to the occurrence, Plaintiff alleges that such concurrent conduct was foreseeable and does not eliminate Defendants' own legal responsibility.

131. Millie experienced catastrophic bodily injury before death, and her Estate and statutory survivors sustained the losses alleged below.

132. Defendants' acts and omissions were factual, legal, direct, proximate, producing, substantial, or moving causes, as applicable to each Count, of the constitutional injury, collision, death, and damages.

## MUNICIPAL POLICY AND DELIBERATE INDIFFERENCE

133. By January 18, 2026, the City knew that dangerous police vehicle operations, red-light entries, policy violations, and unreliable emergency warning equipment created substantial and foreseeable risks of death to innocent motorists, passengers, and pedestrians.

134. The City knew that strict compliance with pursuit and emergency-driving restrictions, reliable warning equipment, and meaningful review and discipline were essential to protect the public.

135. The Alvarez and Neal deaths, additional similar incidents to be established in discovery, and the repeated work orders for patrol vehicle number 10467 gave actual or constructive notice to City policymakers.

136. Despite that notice, the City maintained customs or practices of tolerating dangerous vehicle operations, inadequate intersection-clearing procedures, pursuit or enforcement action disproportionate to minor offenses, inadequate review of policy violations, and continued deployment of vehicles with unresolved intermittent life-safety defects.

137. The City failed to provide recurring, scenario-based training adequate to ensure that officers stop when warning equipment fails, fully clear red-light intersections lane by lane, weigh the need for immediate apprehension against danger to the public, and comply with pursuit and emergency-operation limitations.

138. The City failed to supervise, audit, counsel, retrain, or discipline officers and supervisors in a manner reasonably calculated to correct recurring dangerous vehicle operations, and its failures ratified or condoned the known practices.

139. The City maintained or enforced facially deficient policies that did not provide adequate objective limits, mandatory stop requirements, supervisory controls, or vehicle out-of-service criteria when emergency warning equipment was intermittent, malfunctioning, or lost.

140. Final policymakers knew of, approved, ratified, or deliberately declined to correct the policies, customs, training deficiencies, supervisory failures, discipline failures, and vehicle-deployment practices alleged herein.

141. The need for corrective action was obvious, the consequences of inaction were highly predictable, and the City's deliberate indifference made the violation of innocent persons' Fourteenth Amendment rights a plainly foreseeable consequence.

142. By authorizing officers to create a danger through emergency driving while failing to provide or enforce safeguards and while deploying an unreliable patrol vehicle, the City affirmatively increased the danger to Millie beyond that faced by the public before the police action began.

143. The City's combined policy decisions and deliberate indifference placed Millie in a position of acute, immediate, and particularized danger from which she could not protect herself.

144. Under the circumstances alleged, the municipal conduct was arbitrary, conscience-shocking, and incompatible with the substantive component of the Due Process Clause of the Fourteenth Amendment.

145. The City's policies, customs, practices, omissions, and decisions were moving forces behind the constitutional deprivation and Millie's death within the meaning of 42 U.S.C. § 1983 and Monell.

146. Plaintiff does not seek punitive damages against the City under section 1983 and recognizes that such municipal punitive damages are unavailable under City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981).

**COUNT I**
**WRONGFUL DEATH — NEGLIGENT OPERATION OF MOTOR VEHICLE AGAINST CITY OF ORLANDO**

147. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

148. This action is brought under the Florida Wrongful Death Act, sections 768.16 through 768.26, Florida Statutes.

149. McKuhen owed Millie and other persons lawfully using Orlando roadways a duty to operate the OPD vehicle with reasonable care and due regard for their safety. The statutory privileges applicable to authorized emergency vehicles did not eliminate that duty.

150. McKuhen breached his duties by failing to maintain a proper lookout; failing to yield the right-of-way; entering against a red signal when unsafe; failing to adequately clear the intersection or reduce speed; failing to maintain control or take evasive action; failing to provide adequate visual and audible warning; continuing after the apparent loss of warning equipment; and failing to reasonably weigh immediate enforcement of a suspected illegal U-turn against the danger to innocent traffic.

151. The crash report found McKuhen at fault for failure to yield the right-of-way, and his negligence directly and proximately caused the collision, Millie's catastrophic injuries, and her death.

152. For this state-law negligence claim, Plaintiff alleges that McKuhen acted within the course and scope of employment and did not act in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard within the meaning of section 768.28(9)(a), Florida Statutes.

153. The City is liable to the extent provided by Florida law for the negligence of its employee, and Millie's death was wrongful within the meaning of the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands judgment against the City for the full measure of damages determined by the jury, subject only to limitations on collection imposed by applicable law, together with costs, lawful interest, and all other appropriate relief.

**COUNT II**
**WRONGFUL DEATH — NEGLIGENT MAINTENANCE, INSPECTION, AND**
**DEPLOYMENT OF OPD VEHICLE**
**AGAINST CITY OF ORLANDO**

154. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

155. The City undertook operational responsibility, directly or through employees, agents, contractors, or others acting on its behalf, for maintaining, inspecting, servicing, approving, and deploying OPD vehicles.

156. Having undertaken those functions, the City owed the public, including Millie, a duty to exercise reasonable care to ensure that vehicles authorized for emergency operations were reasonably safe and that safety-critical warning equipment was operational.

157. The City knew or should have known that officers would use the vehicle's warning equipment when exercising emergency-driving privileges and that malfunctioning lights or sirens could prevent motorists from receiving adequate warning of a red-light entry.

158. Before January 18, 2026, repeated and recurring problems were reported, including partially functioning strobes, malfunctioning controls, intermittent siren operation, and nonfunctioning sirens.

159. The City breached its duty by failing to reasonably maintain and inspect the equipment; failing to diagnose intermittent failures; failing to verify permanent correction; failing to remove the vehicle from emergency service; returning or permitting it to remain in service; failing to adopt reasonable intermittent-defect procedures; failing to communicate defects to officers; and failing to ensure correction of the November 2025 report.

160. The foreseeable risk materialized when the warning equipment malfunctioned during the red-light entry, and the City's negligent maintenance, inspection, approval, and deployment were legal and proximate causes of Millie's injuries and death.

161. Millie's death was wrongful under the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands judgment against the City for the full measure of damages determined by the jury, subject only to limitations on

collection imposed by applicable law, together with costs, lawful interest, and all other appropriate relief.

**COUNT III**
**42 U.S.C. § 1983 — MONELL LIABILITY: UNCONSTITUTIONAL CUSTOM OR PRACTICE**
**(PATTERN OF DANGEROUS POLICE VEHICLE OPERATIONS)**
**AGAINST CITY OF ORLANDO**

162. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

163. The Specific Policy or Custom. The City maintained and tolerated a widespread custom or practice of dangerous police vehicle operations: pursuing or taking enforcement action disproportionate to minor suspected offenses; entering signalized intersections against red lights without reliably clearing each lane; proceeding without adequate visual and audible warnings; disregarding or failing to enforce pursuit and emergency-driving limits; and keeping patrol vehicles in emergency service despite unresolved life-safety defects.

164. That custom was reflected in the February 10, 2023 Alvarez pursuit, in which an innocent motorist was killed after a fleeing vehicle entered an intersection against a red signal, and the February 12, 2025 Neal pursuit, in which an innocent pedestrian was struck and killed after both the fleeing vehicle and an unmarked OPD vehicle hit him; it also included additional pursuits, emergency

responses, red-light entries, policy deviations, preventable collisions, complaints, near misses, reviews, and discipline decisions to be established in discovery.

165. The custom extended to the City's treatment of patrol vehicle number 10467: after the March 2020 collision and removal and reinstallation of its emergency lights, the March 2023 report of partially functioning strobes, the February 2025 report of nonfunctioning emergency-control buttons including the siren, the September 2025 report of intermittent siren-box operation, and the November 2025 report that the sirens were not working, the City did not require reliable diagnosis, permanent repair, or removal from service. The City likewise tolerated gaps in recurring scenario-based training, supervisory review, and discipline concerning warning failures, intersection clearing, proportionality, and vehicle safety.

166. The Constitutional Right. The Fourteenth Amendment's substantive due process clause protects the right to bodily integrity and to be free from arbitrary, conscience-shocking government conduct that creates or increases danger. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), and City of St. Louis v. Praprotnik, 485 U.S. 112 (1988), a municipal custom or practice attributable to final policymakers may impose liability when it is the moving force behind a constitutional deprivation; under the deliberate-indifference standard, liability follows where policymakers disregard known or obvious consequences for persons such as Millie.

167. Causation — Moving Force. The City's custom was the moving force behind the deprivation: because dangerous operations and unresolved warning defects were tolerated, McKuhen initiated enforcement action on January 18, 2026, drove patrol vehicle number 10467 into the intersection against a red signal, and continued when its lights appeared steady and then went dark and no adequate siren warning was heard. The malfunctioning equipment left Millie and other lawful motorists without adequate warning, the OPD vehicle entered the Jeep's path, the collision occurred, and Millie died.

168. This was not an isolated accident but the highly predictable consequence of the City's repeated tolerance of dangerous pursuits and emergency driving, its failure to correct known equipment failures, and its inadequate training, supervision, and discipline. The deprivation and death resulted in compensatory damages recoverable under section 1983, with fees and costs available under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff demands judgment against the City for compensatory damages under 42 U.S.C. § 1983, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, lawful interest, and all other appropriate nonpunitive relief.

## COUNT IV
## 42 U.S.C. § 1983 — MONELL LIABILITY: FAILURE TO TRAIN AGAINST CITY OF ORLANDO

169. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

170. The Municipal Failure. The City was responsible for training OPD officers and supervisors on emergency-vehicle operation, red-light entries, lane-by-lane intersection clearing, pursuits and proportionality, warning-equipment failures, vehicle out-of-service decisions, and protection of innocent civilians. The City failed to provide recurring, scenario-based instruction requiring an officer to stop or abort when lights or sirens are absent, steady, intermittent, or lost, and to report and remove a vehicle with an unresolved life-safety defect.

171. The need for that training was obvious from the Alvarez death in 2023, the Neal death in 2025, additional dangerous pursuits and emergency-driving incidents, and the maintenance history of vehicle number 10467: emergency lights were removed and reinstalled after a March 2020 collision; only part of the strobes functioned in March 2023; emergency-control buttons including the siren failed in February 2025; the siren box operated intermittently in September 2025; and the sirens were reported not working in November 2025. Yet the City failed to train officers and supervisors to recognize those failure modes, verify warnings before

entering against a red signal, clear every lane, or discontinue enforcement action when the warning system was unreliable.

172. The Constitutional Right. The Fourteenth Amendment's substantive due process clause protects Millie's right to bodily integrity and to be free from arbitrary, conscience-shocking government conduct that creates or increases danger. Under City of Canton v. Harris, 489 U.S. 378, 388 (1989), a municipality is deliberately indifferent when the need for training is plainly obvious and the inadequacy is highly likely to result in a constitutional violation; the known pattern and equipment reports made that need obvious here.

173. The training failure was not an isolated mistake by one officer. It was a municipal failure to equip officers and supervisors with the specific rules and judgment necessary to prevent foreseeable red-light entries without reliable warning, and it reflected deliberate indifference to the substantive due process right described above.

174. Causation — Moving Force. The training deficiency was the moving force behind the deprivation because it left McKuhen without an enforced, practiced response to the malfunctioning equipment on January 18, 2026. He continued patrol vehicle number 10467 into the intersection against a red signal after the lights appeared steady and then went dark, without an adequate audible warning; the Jeep entered on green, the vehicles collided, and Millie died.

175. That sequence was the highly predictable consequence of the obvious training gap—not an isolated event—and the failure to train legally caused the deprivation of Millie's Fourteenth Amendment rights, her injuries and death, and the resulting compensatory damages recoverable under section 1983, with fees and costs available under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff demands judgment against the City for compensatory damages under 42 U.S.C. § 1983, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, lawful interest, and all other appropriate nonpunitive relief.

**COUNT V**
**42 U.S.C. § 1983 — MONELL LIABILITY: FAILURE TO SUPERVISE AND DISCIPLINE**
**AGAINST CITY OF ORLANDO**

176. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

177. The Municipal Failure. The City was responsible for supervising emergency vehicle operations; investigating crashes and pursuit or emergency-driving policy deviations; auditing body-camera and traffic-camera evidence; tracking repeat complaints, work orders, and near misses; and imposing meaningful counseling, retraining, discipline, and vehicle-removal decisions. It failed to perform those functions in a manner reasonably calculated to prevent recurring danger.

178. Notice was provided by the Alvarez death in 2023, the Neal death in 2025, additional similar incidents, and the repeated work orders for vehicle number 10467: the March 2020 collision and light removal/reinstallation, March 2023 partial strobe operation, February 2025 nonfunctioning control buttons including the siren, September 2025 intermittent siren-box operation, and November 2025 nonfunctioning sirens. Those events required documented review and corrective action, but the City did not ensure that officers, supervisors, or the vehicle were removed from dangerous operations.

179. The City failed to identify systemic causes, enforce pursuit and red-light limits, require lane-by-lane clearance, review the loss of warnings from malfunctioning equipment, counsel or retrain personnel, discipline policy violations, or hold supervisors accountable for deploying an unreliable vehicle. The absence of meaningful review and corrective action ratified and communicated that dangerous operations and unresolved life-safety defects would be tolerated.

180. The Constitutional Right. The Fourteenth Amendment's substantive due process clause protects Millie's right to bodily integrity and to be free from arbitrary, conscience-shocking government conduct that creates or increases danger. Under the ratification doctrine recognized in City of St. Louis v. Praprotnik, 485 U.S. 112 (1988), a municipality may be liable when authorized final

policymakers approve, knowingly disregard, or ratify unconstitutional conduct; deliberate indifference is shown when, despite notice of known or obvious risks, they fail to take reasonable corrective action.

181. By repeatedly accepting inadequate reviews, non-enforcement, and the absence of meaningful discipline after the Alvarez and Neal incidents, additional known-risk events, and the equipment reports, final policymakers ratified the practices that created the danger and made them municipal policy or custom rather than an isolated employee act.

182. Causation — Moving Force. The City's supervision and discipline failure was the moving force behind the deprivation: it permitted McKuhen to undertake enforcement action on January 18, 2026 in vehicle number 10467, permitted the vehicle to remain in service despite the known warning history, and failed to require an immediate stop when the malfunctioning equipment appeared steady, then went dark, and provided no adequate siren warning. The vehicle entered against the red signal, struck the Jeep proceeding on green, and caused Millie's death.

WHEREFORE, Plaintiff demands judgment against the City for compensatory damages under 42 U.S.C. § 1983, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, lawful interest, and all other appropriate nonpunitive relief.

## COUNT VI
## 42 U.S.C. § 1983 — MONELL LIABILITY: UNCONSTITUTIONAL POLICY (FACIALLY DEFICIENT PURSUIT/EMERGENCY VEHICLE POLICY) AGAINST CITY OF ORLANDO

183. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

184. The Municipal Failure. The City promulgated, maintained, approved, or enforced pursuit and emergency-vehicle policies governing when officers may initiate or continue enforcement action, proceed against traffic controls, use warnings, clear intersections, and respond to equipment failure. The policies were facially deficient because they did not impose clear, objective, and mandatory limits proportionate to the danger: no mandatory lane-by-lane clearance, no mandatory discontinuation when lights or sirens are absent, steady, intermittent, or lost, no supervisory authorization or prompt review, and no vehicle out-of-service criteria after recurring warning-equipment failures.

185. The policies also failed to require documentation and escalation of intermittent defects, reliable diagnosis and permanent repair, communication of equipment status to officers, or recurring scenario-based training and supervision concerning red-light entries, pursuits, proportionality, and warning loss. By leaving those decisions to unstructured discretion, the City allowed officers to

create extreme and foreseeable danger to innocent civilians in response to minor suspected offenses.

186. That facial deficiency remained in place despite the Alvarez death in 2023, the Neal death in 2025, additional dangerous pursuits and red-light incidents, and the known history of vehicle number 10467—March 2020 light removal and reinstallation after a collision, March 2023 partially functioning strobes, February 2025 failed emergency-control buttons including the siren, September 2025 intermittent siren-box operation, and November 2025 nonfunctioning sirens. Final policymakers retained or approved the policies without safeguards requiring the vehicle's removal from emergency service.

187. The Constitutional Right. The Fourteenth Amendment's substantive due process clause protects Millie's right to bodily integrity and to be free from arbitrary, conscience-shocking government conduct that creates or increases danger. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a facially deficient municipal policy that authorizes or fails to constrain dangerous conduct can be actionable when it is deliberately indifferent to known or obvious consequences and causes the deprivation; here, the policy's unstructured discretion created a foreseeable danger to lawful intersection users.

188. Causation — Moving Force. The facially deficient policy was the moving force behind the deprivation because it permitted McKuhen to initiate police

action on January 18, 2026, enter against a red signal in vehicle number 10467, and continue despite malfunctioning warning equipment that appeared steady and then went dark and provided no adequate audible warning. Without mandatory clearance, stop, supervisory, and out-of-service safeguards, the OPD vehicle entered the Jeep's path, collided with the vehicle proceeding on green, and caused Millie's death.

189. The collision was not an unforeseeable departure from the written policy; it was the highly predictable consequence of leaving red-light entries, warning failures, vehicle deployment, and enforcement proportionality to unstructured discretion. The policy was therefore a moving force and legal cause of the deprivation of Millie's Fourteenth Amendment rights and the compensatory damages recoverable under section 1983, with fees and costs available under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff demands judgment against the City for compensatory damages under 42 U.S.C. § 1983, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, lawful interest, and all other appropriate nonpunitive relief.

## COUNT VII
## 42 U.S.C. § 1983 — STATE-CREATED DANGER (FOURTEENTH AMENDMENT)
## AGAINST CITY OF ORLANDO

190. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

191. The Affirmative State Action. The City, through its policies, customs, authorized emergency-driving practices, and deployment of patrol vehicle number 10467, affirmatively created or materially increased the danger to lawful users of the intersection, including Millie. The City authorized an officer to undertake enforcement action against a minor suspected traffic offense, enter against a red signal, and rely on a warning system that the City had kept in service despite recurring defects.

192. Before police action began, Millie was proceeding lawfully with a green signal and faced no police-created danger. The City's agent then drove vehicle number 10467 into the intersection; its warning lights appeared steady, went completely dark, and were not accompanied by an adequate audible siren, yet the City's policies and deployment practices did not require the officer to stop, clear the intersection, or abandon the maneuver.

193. The City knew or should have known the danger from the Alvarez death in 2023, the Neal death in 2025, additional pursuits and red-light incidents, and the maintenance history of vehicle number 10467: the March 2020 collision and light

removal/reinstallation, March 2023 partial strobe operation, February 2025 failed control buttons including the siren, September 2025 intermittent siren box, and November 2025 nonfunctioning sirens. It nevertheless failed to impose or enforce objective policy limits, scenario-based training, supervisory review, discipline, or mandatory out-of-service procedures.

194. The Constitutional Right. The Fourteenth Amendment's substantive due process clause protects Millie's right to bodily integrity and to be free from arbitrary, conscience-shocking government conduct that creates or increases danger. Under Waddell v. Hendry County Sheriff's Office, 329 F.3d 1300 (11th Cir. 2003), a state-created-danger claim requires an affirmative act that creates or materially enhances a known danger to an identifiable person or class; under County of Sacramento v. Lewis, 523 U.S. 833 (1998), the conduct must be conscience-shocking, and the alleged municipal choices must reflect deliberate indifference to the known consequences.

195. Those requirements are pleaded here through the City's affirmative authorization and deployment of emergency driving, its continued use of the known-defective vehicle, and its deliberate failure to provide or enforce safeguards; Plaintiff does not premise this Count solely on ordinary negligence by McKuhen.

196. Causation — Moving Force. The City's affirmative state action and related municipal failures were the moving forces behind the deprivation: the City's authorized enforcement response placed Millie in a particularized and immediate danger, the malfunctioning equipment deprived her and Pontier of adequate warning, McKuhen entered against the red signal, the OPD vehicle struck the Jeep proceeding on green, and Millie died.

197. The collision and death were not an isolated accident but the highly predictable consequences of increasing the danger through unstructured emergency-driving authority, deploying vehicle number 10467 despite its documented failures, and failing to train, supervise, discipline, or remove the vehicle from service. The state-created danger and municipal decisions therefore legally caused the deprivation of Millie's substantive due process rights, her injuries and death, and the resulting compensatory damages recoverable under section 1983, with fees and costs available under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff demands judgment against the City for compensatory damages under 42 U.S.C. § 1983, reasonable attorneys' fees and costs under 42 U.S.C. § 1988, lawful interest, and all other appropriate nonpunitive relief.

**COUNT VIII**
**STRICT LIABILITY — DESIGN DEFECT**
**AGAINST FORD MOTOR COMPANY**

198. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

199. Ford was engaged in the business of designing, manufacturing, assembling, marketing, distributing, selling, or supplying the subject product for police and emergency-vehicle use.

200. The product was defective and unreasonably dangerous because its police-rated electrical architecture and integration provisions did not safely and reliably accommodate the foreseeable emergency lighting, siren, control, grounding, load-management, circuit-protection, diagnostic, and redundancy requirements of police upfitting.

201. The design defect existed when the product left Ford's possession or control, and the product reached the ultimate user without a substantial unforeseeable change material to that defect.

202. Ford expected and intended the product to be used in a police vehicle where reliable visual and audible warnings protect the motoring public.

203. The defective condition was a legal and proximate cause of the loss or inadequacy of emergency warning, the collision, Millie's catastrophic injuries, and her death.

204. Under West v. Caterpillar Tractor Co., 336 So. 2d 80 (Fla. 1976), Plaintiff and the statutory survivors are entitled to recover all damages caused by the defective and unreasonably dangerous product.

WHEREFORE, Plaintiff demands judgment against Ford for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT IX**
**STRICT LIABILITY — MANUFACTURING DEFECT**
**AGAINST FORD MOTOR COMPANY**

205. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

206. Ford was engaged in the business of designing, manufacturing, assembling, marketing, distributing, selling, or supplying the subject product for police and emergency-vehicle use.

207. The product was defective and unreasonably dangerous because the subject vehicle's electrical system, wiring, connectors, modules, grounding, circuit protection, or related components deviated from Ford's intended design, specifications, or otherwise identical units and failed to perform as safely as intended.

208. The manufacturing defect existed when the product left Ford's possession or control, and the product reached the ultimate user without a substantial unforeseeable change material to that defect.

209. Ford expected and intended the product to be used in a police vehicle where reliable visual and audible warnings protect the motoring public.

210. The defective condition was a legal and proximate cause of the loss or inadequacy of emergency warning, the collision, Millie's catastrophic injuries, and her death.

211. Under West v. Caterpillar Tractor Co., 336 So. 2d 80 (Fla. 1976), Plaintiff and the statutory survivors are entitled to recover all damages caused by the defective and unreasonably dangerous product.

WHEREFORE, Plaintiff demands judgment against Ford for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT X**
**STRICT LIABILITY — FAILURE TO WARN**
**AGAINST FORD MOTOR COMPANY**

212. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

213. Ford knew or should have known that its police-rated vehicle would be upfitted with emergency lights, sirens, control modules, and associated high-demand electrical equipment.

214. The vehicle presented dangers that were not open or obvious to users or the public concerning integration limitations, compatible loads, grounding, circuit protection, diagnostics, inspection, intermittent failures, and continued use after repair or malfunction.

215. Ford failed to provide adequate warnings and instructions to upfitters, purchasers, operators, and maintainers concerning those dangers and the measures necessary to avoid them.

216. The warnings accompanying the product, if any, were inadequate in content, intensity, placement, or communication for the foreseeable life-safety use.

217. Adequate warnings would have caused a reasonable upfitter or user to employ a safer integration, inspection, repair, or out-of-service decision and would have prevented or reduced the warning-system failure.

218. Ford's failure to warn rendered the product defective and unreasonably dangerous and legally caused the collision, injuries, death, and damages.

WHEREFORE, Plaintiff demands judgment against Ford for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the

extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XI**
**NEGLIGENCE**
**AGAINST FORD MOTOR COMPANY**

219. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

220. Ford owed foreseeable users and bystanders, including Millie, a duty to use reasonable care in the design, manufacture, testing, inspection, validation, marketing, sale, and support of a vehicle intended for police upfitting.

221. Ford breached that duty by failing to provide an electrical architecture reasonably safe for foreseeable upfitting; failing to account for expected loads and failure modes; failing to employ adequate redundancy, isolation, diagnostics, grounding, or circuit protection; failing to test the integrated-use environment; failing to inspect and control manufacturing quality; and failing to provide adequate instructions or warnings.

222. Ford knew or should have known that a failure affecting emergency warning equipment could cause an officer to enter traffic without adequate warning and expose innocent civilians to grave injury.

223. Safer reasonable engineering, testing, quality-control, and warning measures were available.

224. Ford's breaches directly and proximately caused or contributed to the malfunction, inadequate warning, collision, Millie's injuries and death, and Plaintiff's damages.

WHEREFORE, Plaintiff demands judgment against Ford for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST FORD MOTOR COMPANY**

225. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

226. Ford was a merchant with respect to police-rated motor vehicles, and an implied warranty of merchantability arose under section 672.314, Florida Statutes.

227. Ford warranted that the subject vehicle was fit for the ordinary purposes for which police-rated vehicles are used, including safe and reliable foreseeable integration and operation of emergency warning equipment.

228. The subject vehicle was not merchantable because its electrical system and integration architecture were not reasonably fit, safe, or reliable for that ordinary advertised use.

229. The vehicle's unmerchantable condition existed when it left Ford's control, and Ford's marketing and distribution were intended to benefit and influence the purchasing and use of the finished police vehicle. Any applicable privity requirement is satisfied, excused, or subject to recognized exceptions, as discovery will further establish.

230. All required warranty notice was provided, waived, excused, or rendered futile; alternatively, Ford had actual notice through facts and records within its control.

231. The breach of implied warranty legally caused the failure, collision, Millie's death, and resulting damages.

WHEREFORE, Plaintiff demands judgment against Ford for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

## COUNT XIII
## STRICT LIABILITY — DESIGN DEFECT (SYSTEM INTEGRATION) AGAINST PUBLIC SAFETY SUPPLY, LLC

232. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

233. PSS was engaged in the business of designing, manufacturing, assembling, marketing, distributing, selling, or supplying the subject product for police and emergency-vehicle use.

234. The product was defective and unreasonably dangerous because the emergency-equipment integration scheme lacked reasonably safe wiring configuration, power distribution, grounding, load management, circuit protection, connectors, redundancy, fault detection, fail-safe behavior, or compatibility among the Ford platform and Federal Signal components.

235. The design defect existed when the product left PSS's possession or control, and the product reached the ultimate user without a substantial unforeseeable change material to that defect.

236. PSS expected and intended the product to be used in a police vehicle where reliable visual and audible warnings protect the motoring public.

237. The defective condition was a legal and proximate cause of the loss or inadequacy of emergency warning, the collision, Millie's catastrophic injuries, and her death.

238. Under West v. Caterpillar Tractor Co., 336 So. 2d 80 (Fla. 1976), Plaintiff and the statutory survivors are entitled to recover all damages caused by the defective and unreasonably dangerous product.

WHEREFORE, Plaintiff demands judgment against PSS for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XIV**
**STRICT LIABILITY — MANUFACTURING/ASSEMBLY DEFECT AGAINST PUBLIC SAFETY SUPPLY, LLC**

239. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

240. PSS was engaged in the business of designing, manufacturing, assembling, marketing, distributing, selling, or supplying the subject product for police and emergency-vehicle use.

241. The product was defective and unreasonably dangerous because the subject installation, assembly, wiring, programming, connection, grounding, routing, fastening, sealing, strain relief, or component configuration deviated from the intended integration plan, applicable specifications, or properly assembled units.

242. The manufacturing or assembly defect existed when the product left PSS's possession or control, and the product reached the ultimate user without a substantial unforeseeable change material to that defect.

243. PSS expected and intended the product to be used in a police vehicle where reliable visual and audible warnings protect the motoring public.

244. The defective condition was a legal and proximate cause of the loss or inadequacy of emergency warning, the collision, Millie's catastrophic injuries, and her death.

245. Under West v. Caterpillar Tractor Co., 336 So. 2d 80 (Fla. 1976), Plaintiff and the statutory survivors are entitled to recover all damages caused by the defective and unreasonably dangerous product.

WHEREFORE, Plaintiff demands judgment against PSS for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

## COUNT XV
## STRICT LIABILITY — FAILURE TO WARN
## AGAINST PUBLIC SAFETY SUPPLY, LLC

246. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

247. PSS knew the specific life-safety purpose of the completed police vehicle and knew or should have known the limitations and failure modes created by its chosen components and integration.

248. PSS failed to provide adequate warnings and instructions concerning inspection, maintenance, testing, troubleshooting, reprogramming, collision

repair, intermittent operation, system limitations, and mandatory removal from service after recurring failures.

249. Those dangers were not open or obvious to the public and were not adequately communicated to the City, operators, or maintainers.

250. Adequate warnings and instructions would have prompted correction, safer maintenance, or removal of the vehicle from emergency service before January 18, 2026.

251. PSS's failure to warn rendered the completed system defective and unreasonably dangerous and legally caused the inadequate warning, collision, injuries, death, and damages.

WHEREFORE, Plaintiff demands judgment against PSS for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XVI**
**NEGLIGENCE**
**AGAINST PUBLIC SAFETY SUPPLY, LLC**

252. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

253. PSS owed foreseeable users and bystanders a duty to use reasonable care in selecting components and designing, assembling, wiring, programming, testing, inspecting, documenting, and supporting the integrated warning system.

254. PSS breached that duty by employing an unsafe integration; improperly installing or configuring components; failing to ensure compatibility; failing to provide adequate redundancy, grounding, circuit protection, load management, environmental protection, strain relief, diagnostics, or fail-safe operation; failing to conduct adequate acceptance and durability testing; and failing to provide adequate warnings and maintenance criteria.

255. PSS further breached its duty, while it maintained the subject vehicle's emergency equipment from the upfit until in or around March 2025, by failing to reasonably inspect, diagnose, and permanently repair the March 2023 partial strobe failure and the February 2025 nonfunctioning emergency-control buttons, including the siren, and by failing to recommend removal of the vehicle from emergency service.

256. PSS knew that failure of the integrated system during emergency driving would expose innocent motorists and passengers to a foreseeable risk of death.

257. Reasonable alternative integration methods and quality-control measures were available.

258. PSS's negligence directly and proximately caused or contributed to the malfunction, collision, Millie's death, and resulting damages.

WHEREFORE, Plaintiff demands judgment against PSS for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XVII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**AGAINST PUBLIC SAFETY SUPPLY, LLC**

259. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

260. PSS was a merchant with respect to police-vehicle upfitting and emergency warning systems, and an implied warranty of merchantability arose under section 672.314, Florida Statutes.

261. PSS warranted that the completed upfit and warning system were fit for ordinary police emergency use.

262. The completed system was not merchantable because it was not reasonably safe, reliable, durable, or fit for the ordinary purpose of warning the public during emergency vehicle operations.

263. The breach existed when the completed upfit left PSS's control. Any applicable privity requirement is satisfied, excused, or subject to recognized

exceptions because the completed system was supplied for the direct benefit and use of the City and to protect foreseeable members of the public.

264. All required warranty notice was provided, waived, excused, or rendered futile.

265. The breach legally caused the system failure, collision, injuries, death, and damages.

WHEREFORE, Plaintiff demands judgment against PSS for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

## COUNT XVIII
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
## AGAINST PUBLIC SAFETY SUPPLY, LLC

266. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

267. PSS knew the particular purpose for which the completed vehicle and warning system were required: reliable life-safety warning during police emergency operations, including entries against ordinary traffic controls.

268. PSS knew that the purchaser relied on PSS's skill and judgment to select, configure, integrate, and install equipment fit for that purpose.

269. Under section 672.315, Florida Statutes, PSS impliedly warranted that the integrated system would be fit for the known particular purpose.

270. The system was unfit because it was susceptible to the intermittent, steady-light, control, siren, and complete-output failures alleged herein.

271. Any applicable privity or notice requirement is satisfied, waived, excused, or subject to recognized exceptions.

272. PSS's breach legally caused the inadequate warning, collision, injuries, death, and damages.

WHEREFORE, Plaintiff demands judgment against PSS for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

## COUNT XIX
## WRONGFUL DEATH — NEGLIGENT MAINTENANCE, INSPECTION, AND REPAIR OF OPD VEHICLE (POST-ACQUISITION MAINTENANCE) AGAINST DANA SAFETY SUPPLY, INC.

273. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

274. This Count is brought under the Florida Wrongful Death Act, sections 768.16 through 768.26, Florida Statutes, and is limited to Dana's conduct from in

or around March 2025, when Dana assumed responsibility for maintaining the subject patrol vehicle, through January 18, 2026.

275. By undertaking, for consideration, to service, maintain, inspect, diagnose, and repair the emergency warning equipment on the subject patrol vehicle, Dana owed foreseeable users of the roadway, including Millie, a duty to exercise reasonable care in performing that undertaking.

276. Dana knew or should have known that the subject patrol vehicle's lights and sirens were life-safety equipment that officers would rely upon when entering intersections against traffic controls, and that a failure of that equipment would expose innocent motorists and passengers to a foreseeable risk of death.

277. Dana knew or should have known of the vehicle's history of warning-equipment problems, including the March 2020 removal and reinstallation of the emergency lights after a collision, the March 2023 report of partially functioning strobes, and the February 2025 report of nonfunctioning emergency-control buttons, including the siren, which could not be replicated and was not repaired.

278. In September 2025, during Dana's period of responsibility, a work order documented intermittent operation of the siren box and indicated that manipulation of the controls was required and that, even then, the equipment might not function; no repair was made because the equipment operated during that inspection.

279. In November 2025, during Dana's period of responsibility, a work order reported that the sirens were not working and indicated that the siren box might require reprogramming.

280. Dana breached its duty by failing to adequately diagnose the intermittent failures under conditions reasonably calculated to reproduce them; failing to repair, reprogram, or replace the siren box, controls, wiring, connections, or related components; returning the vehicle to service without verifying permanent correction; failing to review and act upon the vehicle's prior warning-equipment history; failing to complete or follow up on the November 2025 report; and failing to advise the City that the vehicle should be removed from emergency service until the warning system was reliably repaired.

281. Reasonable maintenance, diagnostic, and repair practices were available and would have identified and corrected the condition, or resulted in removal of the vehicle from emergency service, before January 18, 2026.

282. Dana's negligence directly and proximately caused or contributed to the malfunction of the emergency warning equipment during the red-light entry, the collision, Millie's catastrophic injuries and death, and Plaintiff's damages, subject to allocation of fault under section 768.81, Florida Statutes, as applicable.

283. Millie's death was wrongful, and the Estate and statutory survivors are entitled to all damages recoverable under the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands judgment against Dana for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XX**
**STRICT LIABILITY — MANUFACTURING DEFECT**
**AGAINST FEDERAL SIGNAL CORPORATION, INC.**

284. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

285. Federal Signal was engaged in the business of designing, manufacturing, assembling, marketing, distributing, selling, or supplying the subject product for police and emergency-vehicle use.

286. The product was defective and unreasonably dangerous because one or more installed light, siren, controller, power, wiring, connector, or related components deviated from Federal Signal's intended design, specifications, or otherwise identical units and failed to perform reliably.

287. The manufacturing defect existed when the product left Federal Signal's possession or control, and the product reached the ultimate user without a substantial unforeseeable change material to that defect.

288. Federal Signal expected and intended the product to be used in a police vehicle where reliable visual and audible warnings protect the motoring public.

289. The defective condition was a legal and proximate cause of the loss or inadequacy of emergency warning, the collision, Millie's catastrophic injuries, and her death.

290. Under West v. Caterpillar Tractor Co., 336 So. 2d 80 (Fla. 1976), Plaintiff and the statutory survivors are entitled to recover all damages caused by the defective and unreasonably dangerous product.

WHEREFORE, Plaintiff demands judgment against Federal Signal for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XXI**
**STRICT LIABILITY — DESIGN DEFECT**
**AGAINST FEDERAL SIGNAL CORPORATION, INC.**

291. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

292. Federal Signal was engaged in the business of designing, manufacturing, assembling, marketing, distributing, selling, or supplying the subject product for police and emergency-vehicle use.

293. The product was defective and unreasonably dangerous because the emergency warning components were susceptible to intermittent output, steady rather than flashing illumination, loss of siren or light output, control malfunction,

reprogramming problems, or inadequate fault detection under foreseeable police use.

294. The design defect existed when the product left Federal Signal's possession or control, and the product reached the ultimate user without a substantial unforeseeable change material to that defect.

295. Federal Signal expected and intended the product to be used in a police vehicle where reliable visual and audible warnings protect the motoring public.

296. The defective condition was a legal and proximate cause of the loss or inadequacy of emergency warning, the collision, Millie's catastrophic injuries, and her death.

297. Under West v. Caterpillar Tractor Co., 336 So. 2d 80 (Fla. 1976), Plaintiff and the statutory survivors are entitled to recover all damages caused by the defective and unreasonably dangerous product.

WHEREFORE, Plaintiff demands judgment against Federal Signal for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

## COUNT XXII
## STRICT LIABILITY — FAILURE TO WARN
## AGAINST FEDERAL SIGNAL CORPORATION, INC.

298. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

299. Federal Signal knew or should have known of the products' failure modes, compatibility limitations, maintenance requirements, inspection needs, useful-life limits, and risks associated with intermittent operation or reprogramming.

300. Federal Signal failed to provide adequate warnings and instructions to integrators, purchasers, operators, and maintainers concerning those dangers and the need to remove affected equipment from service.

301. The dangers were not open or obvious to Millie or the motoring public, and the warnings provided, if any, were inadequate in content, prominence, or communication.

302. Adequate warnings would have led to a safer component selection, integration, inspection, repair, or out-of-service decision.

303. The failure to warn rendered the products defective and unreasonably dangerous and legally caused the warning failure, collision, death, and damages.

WHEREFORE, Plaintiff demands judgment against Federal Signal for compensatory damages, costs, prejudgment and postjudgment interest, punitive

damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XXIII**
**NEGLIGENCE**
**AGAINST FEDERAL SIGNAL CORPORATION, INC.**

304. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

305. Federal Signal owed foreseeable users and bystanders a duty to reasonably design, manufacture, test, inspect, validate, market, distribute, and support emergency warning products intended for police use.

306. Federal Signal breached its duty by failing to design against foreseeable intermittent and complete failures; failing to provide adequate redundancy, diagnostics, environmental durability, compatibility, quality control, testing, instructions, warnings, and post-sale safety information; and failing to correct known or knowable hazards.

307. Federal Signal knew that failure during a red-light entry could deprive innocent motorists of the only practical warning of an approaching police vehicle.

308. Reasonable alternative designs, quality controls, warnings, and support measures were available.

309. Federal Signal's negligence directly and proximately caused or contributed to the warning failure, collision, Millie's death, and damages.

WHEREFORE, Plaintiff demands judgment against Federal Signal for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XXIV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST FEDERAL SIGNAL CORPORATION, INC.**

310. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

311. Federal Signal was a merchant with respect to emergency warning equipment, and an implied warranty of merchantability arose under section 672.314, Florida Statutes.

312. Federal Signal warranted that its products were fit for their ordinary purpose of providing reliable visual and audible warning during police emergency operations.

313. The installed components were not merchantable because they were not reasonably reliable, safe, durable, or fit for that ordinary purpose.

314. The unmerchantable condition existed when the products left Federal Signal's control. Any applicable privity requirement is satisfied, excused, or subject to recognized exceptions because the products were marketed and

supplied for the direct benefit of law-enforcement users and protection of the public.

315. All required warranty notice was provided, waived, excused, or rendered futile.

316. The breach legally caused the loss of warning, collision, injuries, death, and damages.

WHEREFORE, Plaintiff demands judgment against Federal Signal for compensatory damages, costs, prejudgment and postjudgment interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other just relief.

**COUNT XXV**
**WRONGFUL DEATH (PRODUCT LIABILITY) AGAINST ALL PRODUCT LIABILITY DEFENDANTS**
**AGAINST FORD MOTOR COMPANY, PUBLIC SAFETY SUPPLY, LLC, AND FEDERAL SIGNAL CORPORATION, INC.**

317. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

318. This Count is brought under the Florida Wrongful Death Act, sections 768.16 through 768.26, Florida Statutes, against the Product Liability Defendants.

319. Each Product Liability Defendant supplied a product, component, integration, assembly, warning, or service that was defective, unreasonably

dangerous, negligent, in breach of warranty, or a combination thereof as alleged in the preceding product-liability Counts.

320. The respective defects and breaches operated separately or concurrently to cause the emergency warning system to provide inadequate visual and audible warning during the red-light entry.

321. The inadequate warning and resulting collision were foreseeable consequences of defects in a police vehicle and warning system intended to protect the public during emergency operations.

322. Each Product Liability Defendant's conduct or product was a substantial factor and legal cause of Millie's catastrophic injuries and death, subject to allocation of fault under section 768.81, Florida Statutes, as applicable.

323. Millie's death was wrongful, and the Estate and statutory survivors are entitled to all damages recoverable under the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands judgment against the Product Liability Defendants for the full measure of wrongful-death damages, allocated as the law requires, together with costs, interest, punitive damages to the extent permitted by law and after compliance with section 768.72, Florida Statutes, and all other appropriate relief.

**COUNT XXVI**
**LOSS OF CONSORTIUM / SURVIVOR DAMAGES AGAINST ALL DEFENDANTS**
**AGAINST ALL DEFENDANTS**

324. Plaintiff realleges paragraphs 1 through 146 to the extent consistent with this Count.

325. This Count pleads derivative survivor and consortium damages under section 768.21, Florida Statutes, against each Defendant whose wrongful act or omission is found to have legally caused Millie’s death.

326. Judy Santiago, Evelyn Alicea, and Antonio Ortiz are Millie’s adult children and statutory survivors.

327. The survivors have suffered the loss of Millie’s support and services from the date of injury to death and future loss of support and services, with interest and present-value adjustments as provided by law.

328. To the extent the statutory predicates are established, the survivors have suffered loss of parental companionship, instruction, and guidance and mental pain and suffering from the date of injury.

329. Any survivor who paid medical or funeral expenses because of Millie’s injury and death is entitled to recover those expenses.

330. The losses alleged are derivative of the wrongful-death and other liability established against Defendants and are recoverable only as authorized by the Florida Wrongful Death Act, without duplication of damages.

331. As a direct and proximate result of Defendants' acts and omissions, the statutory survivors sustained substantial damages to be determined by the jury.

WHEREFORE, Plaintiff demands judgment against all Defendants found liable for all survivor and consortium damages authorized by section 768.21, Florida Statutes, without duplication, together with costs, lawful interest, and all other appropriate relief.

**DAMAGES**

332. Plaintiff brings this action as Personal Representative on behalf of Millie's Estate and all statutory survivors.

333. The statutory survivors seek all damages available under section 768.21, Florida Statutes, including loss of support and services; loss of companionship, protection, parental companionship, instruction, and guidance where authorized; mental pain and suffering where authorized; medical or funeral expenses paid by a survivor; and all other recoverable damages.

334. The Estate seeks all damages available under section 768.21, including lost earnings from injury to death; loss of prospective net accumulations where permitted; medical and funeral expenses chargeable against the Estate; and all other recoverable Estate damages.

335. For the federal Counts, Plaintiff seeks full compensatory damages under 42 U.S.C. § 1983, together with reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

336. Plaintiff seeks punitive damages against the Product Liability Defendants and Dana only to the extent a reasonable evidentiary basis is established and leave to plead or pursue such damages is granted under section 768.72, Florida Statutes. Plaintiff does not seek punitive damages against the City under section 1983.

337. Florida's sovereign-immunity payment limitations do not cap damages recoverable from the private Product Liability Defendants or Dana and do not cap recovery on the federal section 1983 claims. Any limitation applicable to collection of state-law damages from the City does not limit the jury's determination of full damages to the extent permitted by law.

338. The Estate's and survivors' damages substantially exceed the amount the City may presently be obligated to pay without further authorization under section 768.28, Florida Statutes.

339. Plaintiff seeks entry of judgment for the full amount determined by the trier of fact and expressly preserves the right to pursue any portion exceeding applicable statutory payment limitations through every procedure and remedy authorized by Florida law, including presentation of an appropriate claim to the Florida Legislature.

340. Discovery may establish liability insurance, excess insurance, indemnification agreements, contractual risk-transfer provisions, self-insurance arrangements, or other lawful sources from which amounts exceeding statutory payment limitations may be paid, and Plaintiff reserves all rights concerning those sources.

341. Any comparative fault shall be determined and allocated under section 768.81, Florida Statutes, as applicable, without reducing or impairing rights available under federal law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, as Personal Representative of the Estate of Milagros “Millie” Ortiz and on behalf of all statutory survivors, respectfully requests that this Court:

A. enter judgment against all Defendants found liable;

B. award the full compensatory damages determined by the jury under the Florida Wrongful Death Act, including all damages recoverable by Millie’s statutory survivors and Estate;

C. award compensatory damages under 42 U.S.C. § 1983 against the City on the federal Counts;

D. award reasonable attorneys’ fees and costs under 42 U.S.C. § 1988 on the federal Counts;

E. award punitive damages against the Product Liability Defendants and Dana to the extent permitted by law and upon the showing and authorization required by section 768.72, Florida Statutes;

F. award prejudgment and postjudgment interest as authorized by law;

G. award taxable costs;

H. enter judgment reflecting the full damages established at trial notwithstanding any statutory limitation on the City's immediate obligation to pay, to the extent authorized by law;

I. preserve Plaintiff's right to pursue amounts exceeding applicable statutory payment limitations through procedures authorized by Florida law, including the Florida Legislature; and

J. award such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Michael D. Cerasa*
Michael D. Cerasa, Esq. (Lead Counsel)
Florida Bar No. 0015085
ROMANUCCI & BLANDIN, LLC
321 N. Clark St., Suite 900

Chicago, IL 60654
Tel: 312.253.8618
mcerasa@rblaw.net

Sue-Ann Robinson, Esq.
Florida Bar No. 29463
sueann@bencrump.com
Gabrielle Higgins, Esq.
Florida Bar No. 1025840
gabrielle@bencrump.com
BEN CRUMP LAW
614 S. Federal Highway
Fort Lauderdale, FL 33301

*Counsel for Plaintiff*